Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

55ø

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1652 | **DATE** | 6/4/2001 |
| **CASE TITLE** | CNA Reinsurance Company vs. Trustmark Insurance Company | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the foregoing reasons, Petitioner CNA's petition to compel arbitration in the Northern District of Illinois is DENIED (5-1), Respondent Trustmark's cross-petition to compel arbitration in London is DENIED (15-1), and Respondent Trustmark's motion to dismiss on the ground of *forum non conveniens* is GRANTED (19-1). The preliminary injunction (26-1, 7-1) previously entered in this case is VACATED. All other pending motions are moot. (51-1,46-1,35-1,2,34-1,22-1,20-1,18-1,17-1,16-1,2,3,6-1,2,5-2)

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | JUN - 5 2001 | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | 65 |
| | Mail AO 450 form. | ED-7 FILED FOR DOCKETING | docketing deputy initials |
| | Copy to judge/magistrate judge. | 01 JUN -4 PM 5: 36 | date mailed notice |
| TP | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUN - 5 2001

CNA REINSURANCE COMPANY, LTD, )
)
    Petitioner, )
) No. 01 C 1652
v. )
) HONORABLE JOHN A. NORDBERG
TRUSTMARK INSURANCE COMPANY, )
)
    Respondent. )

## MEMORANDUM OPINION AND ORDER

Petitioner CNA Reinsurance Company, Limited ("CNA Re") has filed a petition to compel arbitration in this district, pursuant to Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4. Respondent Trustmark Insurance Company ("Trustmark") has filed a cross petition to compel arbitration in London and has moved to dismiss the petition on various grounds, including *forum non conveniens*.

## BACKGROUND

A good portion of the critical facts, and their legal consequences, are hotly contested by the parties.[1] The gist of the dispute, however, can be summarized as follows. CNA Re, a United Kingdom corporation, is a significant presence in the London insurance/reinsurance market ("London market"). CNA Re is also the wholly-owned subsidiary of CNA Financial Corporation ("CNA-USA"), which is located in the Northern District of Illinois.

---

[1] This necessitated the lengthy hearing which occurred in this case. Not only was the receipt of a significant amount of evidence necessary for this court to reach a reasoned decision, but also essential to providing the Seventh Circuit with an adequate record for its almost inevitable review of the complex and somewhat novel issues raised in this case.

CNA Re contracted to reinsure a significant portfolio of insurance business relating to worker's compensation liability ("the Storebrand business"). In essence, a direct insurer contracted to provide insurance coverage, and the direct insurer lowered its relative risk of potential claims by "reinsuring" a portion of the underlying insurance coverage with CNA Re. As is common practice in the reinsurance business, CNA Re sought to manage its potential liability by further reinsuring a portion of the Storebrand business risk. In doing so, in the parlance of the London market, CNA Re was acting as a "ceding company" reinsuring a book of business with a "retrocessionaire" (the up the line re-reinsurer). It is this second level reinsurance transaction that is the basis of the dispute.

CNA Re delegated the authority to place this reinsurance business in the London market with another British company, IGI Underwriting Agencies Limited ("IGI"), that acted as CNA Re's managing general agent. IGI further located a London market broker, Stirling Cooke Brown Insurance Brokers Limited ("SCB"), to assist with finding a suitable retrocessionaire. On the other side of the transaction, Trustmark was seeking to act as a reinsurer/retrocessionaire, and had retained WEB Management LLC ("Web") to act as Trustmark's agent in acquiring such business. Neither Trustmark, an Illinois corporation, nor Web, a Connecticut corporation, was licensed or authorized to do business in London.

As is apparently the practice in the London market, the negotiations for the reinsurance agreement between CNA Re and Trustmark were handled entirely by their respective agents, IGI and Web. Moreover, there was no direct contact between IGI and Web, as all communications regarding the agreement were made through the broker, SCB, who acted as a complete go-

between.[2] After preliminary negotiation, a draft "slip" was prepared by SCB. The slip is an abbreviated reinsurance agreement that provides a brief (3 pages) summary of the parties and terms of the agreement. Significantly, the slip only specifies the most critical terms of the agreement, e.g., the parties, premiums, term covered, etc. The general terms are merely listed by heading, e.g., "Insolvency Clause," "Arbitration Clause," without any text or further elaboration. The record indicates that, in some cases, the slip is succeeded by a fully-worded reinsurance contract (the "treaty" in London market parlance), in which all the terms are completely set out. However, because such fully-worded treaties are not always prepared, in the practice of the reinsurance industry, the summary "slip" is treated as the binding contract. The parties agree that the reinsurance industry has functioned this way for many years, with multimillion dollar obligations being assumed and carried out on the strength of these summary documents. (*See, e.g.*, Louw Testimony, Transcript of March 27, 2001 at 498.) This practice is a relic of the pre-word processor age, when lengthy documents were difficult to prepare. (*Id.* at 499.)

After the initial draft slip was prepared, further negotiations took place. While not entirely clear, it appears that most of the communication between SCB in London and Web in Connecticut took place by telephone, e-mail, mail, or fax. SCB ultimately prepared a final version of the slip, which was sent to Web for signature. The slip was executed by Web, on behalf of Trustmark, in Connecticut on January 25, 1999.[3] (*See* CNA Re Exhibit 2A.) Web returned the slip to SCB, and SCB submitted the executed slip to IGI, who accepted it on behalf of CNA Re. The final slip

---

[2] IGI had never previously done business with SCB; Web and SCB appear to be related entities although the degree of involvement between the companies is disputed.

[3] Because neither Web nor Trustmark was licensed to do business in England, they could not execute the contract there.

3

included the words "Arbitration Clause" in a laundry list of 14 "General Conditions." (*See* CNA Re Exhibit 2A at 3.) The slip also included the following provision, "WORDING: To be agreed." (*Id.*) No final, fully-worded reinsurance treaty was ever prepared. Moreover, the parties agree that there was no negotiation, nor for that matter the barest mention, of the arbitration provision in the parties' communications.

The Storebrand business resulted in very substantial insurance liability. In early 2000, CNA Re began negotiations to settle their Storebrand obligations, and also contacted Trustmark, as retrocessionaire, to discuss the matter. CNA-USA handled some of these communications with Trustmark. For its part, Trustmark sought further information about the Storebrand business and other liabilities. The parties dispute whether Trustmark's queries were answered in full. (*See* CNA Re Exhibits 10 & 12). On June 21, 2000, CNA Re advised Trustmark that CNA Re had successfully settled the Storebrand matter, and that Trustmark, as retrocessionaire, owed CNA Re the sum of $12,301,000 as a result of the settlement (a "cash call" in industry parlance). (*See* CNA Re Exhibit 11.) On March 5, 2001, Trustmark's London counsel notified CNA Re that Trustmark was repudiating ("avoiding" in British parlance) their obligations under the slip on the grounds of misrepresentation and failure to disclose material information. (*See* CNA Re Exhibit 13.) Trustmark also tendered the return of the premium that CNA Re had previously paid. In Trustmark's view, "the dispute is over whether London-based IGI and London-based SCB, when they were placing the business with Trustmark, informed Trustmark about the existence of the Norwegian Storebrand treaty that had been placed with London-based CNA Re(UK) by London-based Willis Faber & Dumas." (Trustmark Closing Brief at 10n.15.)

4

On March 8, 2001, CNA Re filed this action to compel arbitration in this district. A few days later, Trustmark, through their English counsel, filed an action in London seeking to compel arbitration in London. After hearing the parties and reviewing a number of motions that had been filed, the court concluded that an evidentiary hearing was essential. As such, the court entered a temporary restraining order (3/21/01), and later a preliminary injunction (3/28/01), forbidding Trustmark from proceeding or continuing to proceed in any other court until this court had completed its hearing and ruled on all relevant matters.

During the course of the continued hearing, the court has received the testimony of numerous witnesses and received voluminous evidence into the record. However, Trustmark was unable to obtain essential witnesses (the employees of placement broker SCB) regarding the negotiation and preparation of the slip agreement. Therefore, Trustmark filed an Offer of Proof seeking a London hearing of the dispute.

The parties crystalize the issues to be decided as follows in their closing trial briefs.

Petitioner CNA Re asserts the following:

1. the parties have a binding agreement to arbitrate;

2. no location of arbitration was ever agreed to, whether explicitly, implicitly, or by custom and practice;

3. arbitration should be ordered in this district pursuant to the Federal Arbitration Act gap-fillers;

4. *forum non conveniens* does not apply and the case can be properly resolved in this district.

Respondent Trustmark asserts the following:

1. the parties have a binding agreement to arbitrate;

2. the parties agreed to arbitrate in London under English law;

5

3. the court should dismiss this case under the doctrine of *forum non conveniens* in favor of the London proceeding;

4. alternatively, if the court decides the seat of arbitration, it should order the arbitration to take place in London;

5. the same result can be reached under either federal or state common law of contract;

6. the court should dismiss the petition for lack of standing, as CNA Re did not make a formal demand for arbitration;

7. Trustmark's Offer of Proof for a London hearing is valid.

## LEGAL STANDARDS

### 1. Arbitration Act

Several provisions of the Federal Arbitration Act ("FAA") and Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("Convention") are potentially relevant to this case.

> 201. Enforcement of Convention
> The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter.
> 9 U.S.C. § 201
>
> 203. Jurisdiction; amount in controversy
> An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States (including the courts enumerated in section 460 of title 28) shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy.
> 9 U.S.C. § 203.
>
> 206. Order to compel arbitration; appointment of arbitrators
> A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States. Such court may also appoint arbitrators in accordance with the provisions of the agreement.

9 U.S.C. § 206.

> 4. Failure to arbitrate under agreement; petition to United States court having jurisdiction for order to compel arbitration; notice and service thereof; hearing and determination
> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by the Federal Rules of Civil Procedure. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.

9 U.S.C. §4

## 2. Arbitration Case law

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Geneva Securities, Inc. v. Johnson*, 138 F.3d 688, 691 (7th Cir. 1998)(internal cite omitted). Further, the question of

whether the parties agreed to arbitrate is for the court rather than the arbitrator, unless the parties have clearly agreed otherwise. *Id.* *See also Independent Truck Builders Union v. Nacco Materials Handling Group, Inc.*, 202 F.3d 965, 968 (7th Cir. 2000). When a contract contains an arbitration clause, there is a presumption of arbitrability; that presumption should not be disregarded unless it is clear the arbitration clause cannot be interpreted to cover the dispute. *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 650 (1986).

If the parties have agreed to arbitrate, but have not specified the location or mechanics of the arbitration, the court may fill the gaps under the FAA. *See Schulze and Burch Biscuit Co., v. Tree Top, Inc.*, 831 F.2d 709, 716 (7th Cir. 1987)( court could supplement clause by naming arbitrator, specifying location, and specifying rules to be applied). If the parties do not specify a location for arbitration, the district court must direct that the arbitration take place in its district, pursuant to 9 U.S.C. § 4. *Jain v. de Mere*, 51 F.3d 686, 690 (7th Cir.), *cert. denied*, 516 U.S. 914 (1995). This rule applies even in contracts between foreign entities, although a foreign entity being compelled to arbitrate in the United States may still challenge the matter on the grounds of personal jurisdiction or move to dismiss on the grounds of *forum non conveniens*. Id. at 692.

### 3. Forum Non Conveniens

"The principle of *forum non conveniens* comes down to this: a trial court may dismiss a suit over which it would normally have jurisdiction if it best serves the convenience of the parties and the ends of justice." *Kamel v. Hill-Rom Company, Inc.*, 108 F.3d 799, 802 (7th Cir. 1997). The court may dismiss the case if there is an adequate, alternative forum to hear the case, and when proceeding "in the chosen forum would result in vexation and oppression to the defendant

8

which would far outweigh the plaintiff's convenience or when the chosen forum would generate administrative and legal entanglements for the trial court..." *Id.*

The alternative forum is both available and adequate if all parties are amenable to process and are within the forum's jurisdiction, and the parties will not be deprived of all remedy or unfairly treated. *Id.* at 803. Once an adequate, alternative forum is determined to exist, the court must carefully balance the relevant public and private interest factors to determine if dismissal is appropriate. "The factors pertaining to the private interests of the litigants include the relative ease of access to sources of proof; availability of compulsory process for the attendance of unwilling witnesses; the cost of obtaining the attendance of willing witnesses; the possibility of viewing the premises, if necessary; and all other practical problems that make trial of a case easy, efficient and economical." *Id.* " The public factors include the administrative difficulties stemming from court congestion; the local interest in having localized disputes decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflicts of laws or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Id.* In performing this analysis, the court must acknowledge that a plaintiff's choice of his home forum is entitled to deference, as litigation would almost undoubtedly be convenient for the plaintiff in his own backyard. *Id.* However, a foreign plaintiff's choice of forum is entitled to less deference. *Id.*

## DISCUSSION

The first issues that normally must be addressed in an arbitration case – whether there is an agreement to arbitrate and whether the dispute falls within the scope of the arbitration clause –

9

are nonissues in this case. The parties have unequivocally stated that they have a valid written agreement to arbitrate.[4] Moreover, as evidenced by their competing motions to compel arbitration in their preferred forums, they are unanimous in their opinion that the dispute falls within the scope of the arbitration clause.[5] The dispute boils down to whether the parties agreed to a location for the arbitration, whether explicitly, implicitly, or by London market custom and practice. However, in attempting to resolve this question, two issues – one a matter of choice of law and the other regarding access to sources of proof – lead us to a *forum non conveniens* analysis.

---

[4] At first blush, the words "arbitration clause" hardly seem like an adequately written contract clause. Nonetheless, while the case law is extremely limited, the two district courts to consider whether the words "arbitration clause" are enough to create an arbitration agreement in the reinsurance context both concluded in the affirmative. *See Allianz Life Insurance Co. v. American Phoenix Life and Reassurance Company*, No. 99-802, 2000 U.S. Dist. Lexis 7216 (D. Minn., March 28, 2000); *North Carolina League of Municipalities v. Clarendon National Insurance Co.*, 733 F.Supp. 1009 (E.D. North Carolina 1990). In *Allianz*, the district court noted that "the reinsurance industry appears to be a world unto itself," and in the longstanding custom of this strange world the skeletal phrase "arbitration clause" creates a binding agreement to arbitrate. 2000 U.S. Dist. Lexis 7216 at *11-13. The British courts concur. *See Hobbs Padgett & Co.(Reinsurance) Ltd. v. J.C. Kirkland, Ltd.*, 2 Lloyd's Rep. 547 (CA 1969)("suitable arbitration clause"). Moreover, the commentators and our appellate court have also noted that arbitration clauses need not be extensive. "[T]he parties do not have to say very much in order to consent to arbitration," and very limited clauses have passed muster. II Ian R. MacNeil et al., Federal Arbitration Law § 17.3.1.2 (1999) (e.g., "Arbitration to be settled in London" and "Arbitration in New York"). All the arbitration provision needs to indicate is that the parties agree to arbitrate all disputes. *Schulze*, 831 F.2d at 716 ("All disputes under this transaction shall be arbitrated in the usual manner"). *See also Colfax Envelope Corp. v. Local No. 458-3M, Chicago Graphic Communications International Union*, 20 F.3d 750, 755 (7th Cir. 1994)("All that is important is that the parties have agreed that arbitration rather than adjudication would be the mode of resolving their disputes.")

[5] This is not surprising, as broad agreements to arbitrate are standard in the reinsurance industry. *See Allianz*, 2000 U.S. Dist. Lexis 7216 at *13-14.

As to location, CNA Re maintains that the "arbitration clause" creates a bare bones obligation to arbitrate all disputes. As the clause provides no further specifics, CNA Re maintains that the FAA and case law must fill in the gaps, notably that the arbitration take place in this district, as instructed by *Jain*. Trustmark maintains that the "arbitration clause" provides for far more, as it incorporates the custom and practice of the London reinsurance market. Trustmark argues that in the absence of a specific agreement to the contrary, London market custom and practice decrees that the arbitration take place in the ceding company's home forum (London) and that the governing law is the law of the ceding company's home forum (English law) ("the ceding company rule"). Trustmark states that the parties, in agreeing to the slip that was prepared by SCB, agreed that SCB's "standard clauses" would be incorporated. Trustmark maintains that SCB's standard arbitration clause for agreements involving a London-based ceding company provides for London as the seat of arbitration and the application of English law. As such, Trustmark maintains that the parties actually agreed to arbitrate the dispute in London and that English law would apply.

The parties dispute what law should guide our analysis. Trustmark asserts that the arbitration agreement must be evaluated under English law, while CNA Re cautions that choice of law is a matter for the arbitrator, citing *Vimar Seguros Y Reaseguros, S.A., v. M/V Sky Reefer*, 515 U.S. 528, 541 (1995). CNA Re is correct --but only after a court has concluded that there is an valid agreement to arbitrate and determined what its terms are. In determining the existence and terms of the agreement in the first instance, a court may well need to consider the law of contract formation in the appropriate jurisdiction.

Normally, a district court in a diversity case applies the choice of law rules of the state in which it sits; however, Trustmark's cross-petition under the Convention appears to provide us original jurisdiction, which Trustmark states indicates federal common law of contracts (generally the Restatement) applies. *See* 9 U.S.C. § 203. *See generally Slaney v. International Amateur Athletic Federation*, 244 F.3d 580, 591(7th Cir. 2001); *In re Aircrash Disaster*, 948 F.Supp. 747, 752-54 (N.D. Ill. 1996). This distinction is inconsequential in this case, as the standard is essentially the same. For contracts, Illinois applies the most significant contacts (Restatement) analysis for making a choice of law determination. *See Curran v. Kwon*, 153 F.3d 481, 488 (7th Cir. 1998). The court must "consider the place of contracting, the place of the negotiation of the contract, the place of performance, the location of the subject matter of the contract and the domicile and nationality of the parties." *Id.* The weighting of these factors will vary depending on the particular issues at stake in the litigation. *Id.* Three of the factors drop out. Place of performance and location of subject matter are irrelevant for this reinsurance agreement, given that performance is writing a check and the subject matter is essentially a "worldwide" contingent financial commitment. (*See* CNA Re Exhibit 11 (cash call) & CNA Re Exhibit 2A (territory of slip)). Place of domicile drops out as neutral; Trustmark is located in this district and CNA Re is located in London. The other two factors point strongly toward London. As to place of contracting, Queens Counsel Michael Collins provided undisputed testimony that the contract was not formed under English law until after Web returned the executed slip to SCB (in London), who forwarded it to IGI (In London)(communication of acceptance). (*See* Transcript of March 27, 2001 at 443.) (*See also* Andrew Briant's Deposition at 38-39 (his final acceptance).) As to the place of negotiation, two of the three entities involved were located in London (SCB and IGI), and

12

any communications between IGI and SCB undoubtedly occurred in London. The third, Web, was located in Connecticut, (which neither side has posited as a likely forum) and communicated with SCB employees in London. Thus, the choice of law analysis indicates English law will apply.[6]

Thus, the court is potentially put in the uneasy position of evaluating the agreement under English law. However, as indicated in Trustmark's Offer of Proof (May 3, 2001), matters are far worse. While the court has heard and assessed the credibility of several witnesses and reviewed a considerable number of documents from both sides, the fact remains that Trustmark has been unable to present any witnesses from SCB. Trustmark argues that these witnesses are essential to a proper and complete resolution of this case. We must conclude that Trustmark is correct. The SCB witnesses were critical players in the negotiations, who not only relayed all communications between IGI and Web, but also prepared the relevant agreements. These witnesses would have critical insight both into the negotiation process and what was intended regarding the slip's terms. The application of foreign law and unavailability of essential foreign witnesses necessitates an assessment of this case under the *forum non conveniens* doctrine.

As to *forum non conveniens*, Trustmark makes a lengthy presentation addressing all the relevant factors, in particular the difficulties in presenting the case in Chicago without the key witnesses. CNA Re takes the opposite tack, and devotes only a paragraph to *forum non*

---

[6]Illinois also appears to have authority regarding choice of law in the insurance area. The factors to consider in determining choice of law for an insurance policy include "the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a rational relationship to the general contract." *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.*, 166 Ill.2d 520, 526-7, 655 N.E.2d 842, 845 (1995) (internal cite omitted). The result is the same under this standard. Most of these factors drop out as inapplicable or split. The three that do not– place of delivery, last act giving rise to a valid contract, and rational relationship to the contract – all point to London.

*conveniens*, questioning its applicability to a petition to compel arbitration, arguing that the ease with which both parties produced witnesses for this proceeding shows the efficacy of proceeding in Chicago, and claiming that the possible SCB witnesses would add nothing of consequence.

We note at the outset that a dismissal on the grounds of *forum non conveniens* in an arbitration case involving foreign entities has been acknowledged as a possible outcome by the Seventh Circuit. *See Jain*, 51 F.3d at 692. That negates CNA Re's other contention that the focus of this proceeding must be entirely upon the parties' arbitration agreement. By its very nature, the doctrine of *forum non conveniens* requires the court to consider the larger context of the dispute -- Trustmark's claim that the contract is invalid due to misrepresentation/failure to disclose regarding the true nature of the risk.

As to the first step in our analysis, we note that there is clearly an adequate alternative forum. The English courts are rightly esteemed, and there has been no suggestion that redressing this dispute is beyond their considerable capabilities. Moreover, all parties (and likely witnesses) would be subject to the English court's jurisdiction, either because they are English entities (CNA Re, SCB, IGI and Willis Faber & Dumas) or because they voluntarily submitted themselves to the English courts (Trustmark).[7] Nor can CNA Re, an English company, seriously contend that it would be treated unfairly in a London court.

As to the public interest factors, we begin with the applicable law, which as discussed above is English law. English courts are obviously the experts at applying English law, a factor that is particularly significant in this case given the near total absence of authority that currently exists

---

[7] The relevant witness from Web, Mr. Ekwall, would also appear to be available in the English forum pursuant to his agreement with Trustmark. (*See* Transcript of May 4, 2001 at 126-7.)

14

interpreting the Arbitration Act of 1996. In these circumstances, an English court's knowledge of the predecessor statutes and the development of the case law would be essential. "The need to apply foreign law strongly points toward dismissal in considering a *forum non conveniens* claim." *Alexander Proudfoot, Plc v. Federal Insurance Co.*, 860 F.Supp. 541, 545 (N.D. Ill. 1994). The other public interest factors are either neutral or favor an English forum. In particular, an English court would have far more experience with London market custom and practice, an understanding of which will be essential to definitively resolving this case. As the reinsurance industry "appears to be a world unto itself," *Allianz*, 2000 U.S. Dist. Lexis 7216 at *11-13, there is considerable advantage in having the case resolved by the courts most familiar with this strange world. Moreover, an English forum would have far more interest in policing London market slips that were placed and negotiated by English entities than would a Chicago forum.[8]

The private interest factors also point strongly to an English forum. CNA Re is an English corporation, as are the other critical entities in this dispute, including IGI and SCB[9], and Trustmark has elected to submit to the English court. That CNA Re's parent corporation is located in Chicago is of no consequence, as CNA-USA took no part in negotiating the slip that is the focus of this dispute. Of critical significance to evaluating both the arbitration clause and resolving the underlying dispute are the agents of SCB, given that they served as the conduit for all negotiations between IGI and Web and prepared all the documents. As CNA Re's counsel quipped, SCB

---

[8] An Illinois forum might have some local interest in protecting the economic interests of an Illinois corporation. Such an interest drops out in this case, however, as Trustmark has chosen the English forum.

[9] In addition, the other entities Trustmark believes will be in involved in resolving the underlying misrepresentation dispute, broker Willis Faber & Dumas and actuarial firm English Matthews Brockman, are located in London.

15

employees now appear to be in the "witness protection" program. (*See* Transcript of March 27, 2001 at 561.) This is not surprising when multimillion dollar lawsuits are in the air. Nonetheless, the English court's power to compel the attendance of the SCB witnesses is a factor of great weight. Moreover, the great bulk of the witnesses, even those that appeared in this proceeding voluntarily, reside in London, and a London forum would obviously reduce the expense and inconvenience in procuring their further testimony at an arbitration proceeding. Deference to CNA Re's choice of forum, which is limited in this case because CNA Re is a foreign corporation, simply must yield given the weight of the other factors.

## CONCLUSION

For the foregoing reasons, Petitioner CNA Re's petition to compel arbitration in the Northern District of Illinois is DENIED, Respondent Trustmark's cross-petition to compel arbitration in London is DENIED, and Respondent Trustmark's motion to dismiss on the grounds of *forum non conveniens* is GRANTED. The preliminary injunction [26-1] previously entered in this case is VACATED. All other pending motions are MOOT.

ENTER:

JOHN A. NORDBERG
Senior United States District Judge

DATED: June 4, 2001

16